FILED
JAMES BONINI
CLERK
04 JUL -1 AM 11:00
INFORMATION COPY
MANDATE NOT YET ISSUED
DIS. CT. # 01-409

FILED
JUN 3 0 2004
LEONARD GREEN, Clerk

NOT RECOMMENDED FOR PUBLICATION

No. 03-4236

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.
This notice is to be prominently displayed if this decision is reproduced.

| | |
|---|---|
| RICHARD ELLISON, | ) |
| Plaintiff-Appellant, | ) |
| v. | ) ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| UNIVERSITY HOSPITAL MOBILE CRISIS TEAM, | ) THE SOUTHERN DISTRICT OF OHIO |
| Defendant-Appellee. | ) |

**Before: SILER and GIBBONS, Circuit Judges; REEVES, District Judge.**[*]

**PER CURIAM.** Plaintiff Richard Ellison appeals a grant of summary judgment for the defendant. As the district court correctly found no evidence that the Mobile Crisis Team (MCT) was a state actor under 42 U.S.C. § 1983, and that Ohio's statutory immunity applied to the state law claim, we **AFFIRM**.

## BACKGROUND

On January 9, 2001, Carol Huth, a state certified health officer and member of the MCT of University Hospital, Inc., received a call on the "hotline," a direct link between the MCT and the Cincinnati Police Department (CPD), from Steve Russo in regard to the plaintiff, Richard Ellison. Russo, then the boyfriend of Ellison's sister Anne Christie, reported he was concerned that Ellison

---

[*]The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

would arrive unannounced at their home in Connecticut, as Russo claimed Ellison had done before, with unknown consequences.

As support for his concern, Russo faxed to Huth a November 30, 2000 letter from Ellison to Christie and a January 6, 2001 "newsletter" that had been received by hundreds of households where Christie lived. The letter stated that "as long as this matter is unresolved, I live in a state of turmoil. I can't sleep, I become agitated . . . wondering what words must I use to evoke a response . . . If I must, I'll keep writing letters. But if and when it becomes apparent that this is going nowhere, I will find you and confront you. At that time, don't expect me to have a lot of patience, because even as I write this, there's not much left." The newsletter's sole subject was Christie. It included photos; a mock interview; false stories about her; and, most significantly, the newsletter's headline of "Anne Not Expected To Make Up With Her Family In Time For Doomsday."

On January 10, Traci Taylor, another MCT health officer, spoke with Ellison's mother by phone. The mother was concerned, but stated she did not think that Ellison was a threat. However, the mother had given the police Ellison's description and arranged for periodic patrols by her house. That same day, Taylor visited Ellison at his home for a "field assessment," but agreed with Ellison to return the next day. When she returned, Ellison was not home. Therefore, Taylor called Ellison's home and left a phone message. Ellison returned this phone message, stating that his issues were none of Taylor's business, that he would not answer questions and that he did not want the MCT to come by his home.

On January 12, after Huth had consulted with a duty psychiatrist and relayed that consultation to Taylor, Taylor returned to Ellison's home where she repeatedly asked Ellison if he intended to

harm his sister. Ellison refused to "contract" for the safety of his sister, although he indicated an intention to visit her at the first opportune moment. He also stated words to the effect that he was going to get closure with Christie "one way or the other" before shutting the door on Taylor. With no ability to assess Ellison, Taylor consulted the duty psychiatrist by phone before filling out an "Application for Emergency Admission in Accordance with ORC § 5122.10" form.

On this form, Taylor indicated her belief that Ellison represented a substantial risk of physical harm and that he would benefit from hospitalization. She also wrote out a "Statement of Belief," indicating the reasons for the emergency admission, wherein she cited Ellison's attitude; an admission that he was obsessed with Christie's lack of familial involvement, combined with a refusal to say how far he would go to resolve it; and that Ellison's mother and sister had both contacted the police. Taylor also referenced Ellison's letter and newsletter as attachments.

Taylor contacted the CPD who arrived with six officers. The officers informed Ellison that although he was not under arrest, he had to accompany them to the hospital. At the hospital, a duty psychiatrist determined Ellison was not a threat and released him.

## ANALYSIS

Summary judgment is reviewed de novo, with all evidence viewed in the light most favorable to the non-moving party. *Chapman v. Higbee Co.*, 319 F.3d 825, 829 (6th Cir. 2003).

**A. 42 U.S.C. § 1983.** For a § 1983 action, Ellison must show that 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) that the deprivation was caused by a person acting under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978). Ellison concedes that the MCT is a private entity. Therefore, to satisfy the "color of state law"

prong, he must show that the MCT was either 1) acting under the compulsion of the state (state compulsion test); 2) engaged in an activity traditionally reserved to the state (public function test); or 3) its activities were sufficiently close and/or controlled by the state that its actions could fairly be attributed to it (nexus test). *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992).

**1. State compulsion.** Ellison does not contend that there was state compulsion.

**2. Public function.** A private party must exercise powers traditionally reserved exclusively to the state to satisfy the public function test. *Id.* Other circuits have generally found that involuntary commitment has not been traditionally reserved solely to the state. *See Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 259-60 (1st Cir. 1994); *Harvey v. Harvey*, 949 F.2d 1127, 1131 (11th Cir. 1992); *Spencer v. Lee*, 864 F.2d 1376, 1380-82 (7th Cir. 1989). In *Ellison v. Garbarino*, 48 F.3d 192 (6th Cir. 1995), this court faced a similar case. However, in *Ellison*, we declined to address the state function test stating that "[c]ourts that have addressed this issue have typically required some historical analysis to determine whether an action is one traditionally the exclusive prerogative of the state," wherein this analysis is generally "state specific." *Id.* at 196. Since no historical analysis was offered, it could not be shown that involuntary emergency commitments were a state function.

Ellison offers some historical analysis that involuntary commitment is a traditional state function, but he concedes that private actors have had authority to commit people involuntarily for around two hundred years. Given that this authority would predate the 1871 precursors of 42 U.S.C. § 1983, we believe Ellison concedes that, as the law currently stands, traditional authority for involuntary commitment is not exclusive to the state in Ohio.

**3. State nexus.** Ellison also fails to generate evidence that the state had a sufficiently close relationship to the MCT as to be a joint participant and/or interdependent with the MCT. *See Wolotsky*, 960 F.2d at 1335. "[I]t must be demonstrated that the state is intimately involved in the challenged private conduct in order for that conduct to be attributed to the state for purposes of section 1983." *Id.*

Here, the CPD referred a complaint presumed to be a medical rather than a criminal issue. The fact that MCT members are state certified loses significance when O.R.C. § 5122.10 is referenced, as it encompasses "[a]ny psychiatrist, licensed clinical psychologist, licensed physician, health officer, parole officer, police officer" among others. Therefore, health officers are not deputies of the state any more than licensed physicians are. "[L]icensing and regulation are not enough to transform private [medical providers] into state actors for section 1983 purposes." *Harvey*, 949 F.2d at 1132. Ellison further relies upon the statutory framework permitting the health officers to detain him to try and implicate state action. However, while "[t]he statutes authorizing or constraining these private activities may or may not be constitutional . . . the activities themselves remain private." *Spencer*, 864 F.2d at 1381. Ellison has not demonstrated a symbiotic relationship between the state and the MCT.

**B. False Imprisonment -** Summary judgment was correct on the false imprisonment claim due to the MCT's statutory immunity under O.R.C. § 5122.34(A). For this immunity to apply, it must first be demonstrated that the statutory scheme was followed. *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 673 N.E. 2d 1311, 1327 (Ohio 1997), *superseded on other grounds by*

O.R.C. § 5122.34(B).  Ellison argues that there is a dispute of material fact as to whether the MCT complied with the statutory scheme.  However, this argument is without merit.

As the MCT complied with the statute, it is entitled to immunity if it acted in "good faith." The former statutory version "exculpated 'persons acting reasonably and in good faith' as contrasted with 'persons acting in good faith,' the language in the current statute." *Littleton v. Good Samaritan Hosp.*, 529 N.E. 2d 449, 457 n.8 (Ohio 1988).  Hence, immunity is based upon the subjective good faith of the MCT without regard to reasonableness.  *Loughran v. Kettering Mem'l Hosp.*, 710 N.E. 2d 773, 776 (Ohio Ct. App. 1998).  Here, the MCT took a measured approach to Ellison where the team members consulted other professionals, and cross-consulted among themselves, before taking action.  Even if the MCT members could have done a better job, it is evident that they did their job in good faith.  Therefore, the MCT is entitled to immunity under O.R.C. § 5122.34(A).

**AFFIRMED.**